Filed 12/20/21  P. v. Brownfield CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089934 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE010747 ) |
| v. | |
| ROBERT JOHN BROWNFIELD, | |
| Defendant and Appellant. | |

In 2016, defendant Robert John Brownfield ran a medical marijuana operation from the home in which he lived with his 14-year-old son.  Defendant grew marijuana in his garage and used the marijuana to make cannabis concentrate.  In a trailer parked on his driveway, officers found 888, 300-milliliter containers of butane, a highly flammable substance that California law prohibits from being used to make cannabis concentrate.  Searches conducted pursuant to two search warrants discovered the evidence of the marijuana operation at defendant's home and that a substantial amount of money had

1

been deposited into and withdrawn from defendant's checking account in the months preceding the investigation into defendant's operation.

Following a jury trial, defendant was convicted of unlawfully manufacturing concentrated cannabis (Health & Saf. Code, § 11379.6, subd. (a)) with an enhancement for being personally armed with a firearm (Pen. Code, § 12022, subd. (c))[1] and child endangerment (§ 273a, sudb. (a)). The trial court struck the firearm enhancement, suspended imposition of sentence, and placed defendant on three years of formal probation.

Defendant contends on appeal: (1) the trial court erred in denying his motion to quash the warrants and suppress evidence; (2) there is insufficient evidence to support the child endangerment conviction; (3) there is insufficient evidence to support the true finding on the gun enhancement; (4) there was insufficient evidence to support the conviction for unlawfully manufacturing cannabis; and (5) it was an abuse of discretion and violation of due process to admit evidence of the potential violence of home invasions and drug activity.

Both search warrants were supported by probable cause that defendant was engaged in an illegal for-profit marijuana operation. Substantial evidence supports the convictions and the enhancement; there is evidence from which a jury could conclude defendant was making marijuana concentrate illegally through the butane extraction method, the storage of a large number of flammable chemicals in the trailer and the potential danger posed by the wiring of the grow area in the garage supports the child endangerment conviction, while the presence of a loaded firearm in defendant's bedroom where marijuana was found, supports the enhancement. Finding no abuse of discretion in admitting the evidence regarding the danger of marijuana operations, we shall affirm.

---

[1] Undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

1. *Investigation and Search*

In February 2016, defendant was living in his Sacramento residence with his 14-year-old son. Sacramento County Sheriff's Detective Ralph Garcia determined a marijuana business called "Patients in Mind" was being run out of the residences of defendant and his mother, codefendant Marion Gudis.[2] Detective Garcia drove by defendant's residence eight to ten times between February and May 2016; each time, a white trailer was parked in the same place on the driveway.

A search warrant was executed on defendant's residence on May 31, 2016. Officers found half of the four-car garage was devoted to growing over 300 marijuana plants. The grow room had table stands, growing lights, timers, ballasts, cooling apparatuses, and irrigation for the plants. Wiring was everywhere and power for the operation was drawn from an electrical subpanel box. About 75 pounds of marijuana and marijuana trimmings were found in a refrigerator-freezer in the garage. The marijuana was stored in bags with labels that Detective Garcia believed to show different marijuana varieties. Concentrated cannabis was also found in the refrigerator-freezer.

Defendant was detained in the living room and a cell phone was found on a coffee table adjacent to where he was detained. An unlocked safe in defendant's kitchen contained one pound of marijuana bud in a bag. The bag had the following label: "Caution. Contents contain medical cannabis. The medication in this container has been dispensed in strict compliance with California Prop 215 for California Health and Safety Code Sections 11362.5." Boxes containing the upper and lower portions of a rifle were to the right of the safe. A large plastic tub found in the kitchen contained two digital

---

[2] Gudis is not a party to this appeal. Her residence is less than a block from defendant's.

3

scales, Pyrex containers, a hot plate, baking tins, miscellaneous packaging, silicone-based cutting board mats, a heat sealer for sealing plastic bags, a paint scraper, and a makeshift bowl fashioned from the bottom of a two-liter soda bottle. A brown, waxy liquid substance was at the bottom of the makeshift bowl.

The master bedroom contained a locked safe which held numerous rifles, shotguns, and handguns, as well as $2,000 in cash. An unlocked nightstand in the master bedroom contained a loaded handgun with a loaded magazine nearby. The master bedroom, which was unlocked, held a significant amount of ammunition; over 6,000 rounds of ammunition were found throughout the house.

Another handgun was found in a desk drawer in the unlocked east bedroom. Loaded magazines for the firearm were kept in the same drawer. Four bags, containing a total of almost a pound of marijuana, were found under the desk. Every firearm found in defendant's residence was legally owned. An unlocked computer drawer in the east bedroom held $4,450 in cash. The east bedroom also had a digital scale and a money counting machine.

A container of carbon dioxide ($CO_2$) with a gauge and coiled tube was found underneath a mobile bar in the residence. Detective Garcia opined that there was nothing about the $CO_2$ container indicating it was used for anything other than entertainment purposes like making carbonated beverages.

The trailer on defendant's driveway was not registered but was bought by defendant in September 2015. Inside the trailer were numerous master case boxes of butane, containing a total of 888, 300-milliliter containers of butane.[3] Butane is an extremely flammable chemical solvent. The trailer was not covered or in the shade.

---

[3] Butane is used to strip the active ingredient in marijuana from the plant when making concentrated cannabis.

The trailer also held a commercial vacuum drier and a five-gallon jug of ethyl alcohol. The alcohol was bought in January 2015 and delivered to Gudis' home in February 2015. The trailer also held mason jars full of chemicals and pizza boxes labeled with what appeared to be different strains of marijuana. One strain was labeled "shatter", a high-grade form of concentrated cannabis. Three of the mason jars held a brown liquid composed of ethanol and concentrated cannabis. One of several black bins in the trailer held 20 glass cylindrical tubes containing marijuana "shake"[4]. On each of the tubes, a coffee filter was secured to the open end with a metal band. A small hole was created on the end opposite from the filtered end, to allow the insertion of the spigot from a butane can. The butane would then be blown or blasted through the tube to create concentrate.

The trailer also held a nonstick pan liner, which could be used to keep the materials from sticking to the surface of the oven when making marijuana concentrate. A 20-gallon bubble hash machine was found in the trailer, as were a vacuum purge pump, a vacuum oven, and hot plates[5].

Gudis' home was searched pursuant to a warrant on May 31, 2016. Officers found two cell phones in the living room. A refrigerator held coffee filters with a brown, waxy substance on them. Six small glass containers with a brown waxy substance, a vape pen refill and a small vial with a brown, waxy substance were all found in the office. The office also held edible marijuana products, like candy bars and gummy bears, and a refrigerator held various cannabis products and marijuana in storage containers. Pay-owe sheets for Patients in Mind were also found in Gudis' residence, while an office safe held

---

[4] "Shake" is marijuana ground into a finer material.

[5] Hot plates accelerate the evaporation of the solvent from the tetrahydrocannabinol (THC) oil. The vacuum oven and the vacuum purge pump are used in combination to help remove the solvent from the cannabis oil. Extracting concentrated cannabis using the bubble hash machine would be legal in California but was a very long process involving sifting through different screens. No such screens were found in the trailer.

$3,403.20 in cash. There was also a freight bill signed by Rob Brownfield for a pump made by Across International, a company that makes an oven for honey oil laboratories.

A freezer in Gudis' home held two boxes containing a total of 24 cans of the same butane found in defendant's trailer. Additional coffee filters with the brown, waxy substance were also found there.

A Sacramento Municipal Utility District (SMUD) representative testified that a home defendant's size typically used 1,500 kilowatts a month, while defendant's home used 11,000 to 12,000 kilowatts a month in 2016. When electricity is consumed continuously throughout the day, wires do not have the chance to cool, which risks causing parts of the electric panel to fail. The panels in the garage were not rated to run high amperage continuously, which risked having the wires fail and a fire starting. A fire could start anywhere from the SMUD's transformer to the grow light. Defendant's residence had two grow rooms, each having at least six grow lights. The grow lights, which can get as hot as 570 degrees Fahrenheit, are so hot they can cause a fire.

The wiring in the grow area was non-permitted and hazardous. The SMUD representative turned off the power to defendant's home because of the dangerous, non-permitted wiring.

### 2. Aaron Matthews

Aaron Matthews testified under a grant of immunity. In 2016, he lived in Sacramento and had a phone number ending in 7983. He was using butane to extract marijuana through a closed loop system during this time. This method allowed the butane to be recovered and not escape into the atmosphere, reducing the risk of explosion. Another method was open blasting, which involved forcing butane into a tube with a filter on it, thereby allowing the butane to go into the atmosphere, creating a risk of ignition and explosion. His closed loop system could handle a pound of marijuana at a time and yield 45 grams of concentrate from a pound of marijuana. In 2016, Matthews would extract marijuana with his closed loop butane method for others, who would

6

provide him with marijuana trim[6] or flowers.  He was paid with money or a portion of the concentrate.

An oven is used on the end product to remove any remaining butane from the concentrated cannabis.  The final product is called "shatter," "batter," or "butter" but is all oil.  Concentrated cannabis oil is packaged in gram or half-gram amounts.  The yield is the weight of the marijuana oil as a percentage of the marijuana it is extracted from.

Matthews went to "Orbit," an event for marijuana vendors and patients to meet. He tried to get business there, letting his clients know he was using butane to make concentrated cannabis.  Most people he worked with knew he used butane extraction, and he never told anyone he was using the CO2 method rather than butane.  Matthews knew the butane extraction method was illegal in 2016.

3. *Expert Testimony*

Detective Garcia gave expert testimony that growing marijuana at one's home is an inherently dangerous business.  He had investigated robberies and home burglaries related to marijuana.

Testifying as an expert on manufacturing concentrated cannabis using the butane extraction method, Sacramento County Sheriff's Detective Duke Lewis had gone to at least 10 butane extraction labs that exploded.  One can of butane is capable of exploding and causing a fire.  The risk of explosion increases greatly when the butane is contained in small, enclosed areas.  He had been to many places where butane cans exploded, causing death or property damage.

Making marijuana concentrate through butane extraction begins by grinding marijuana into "shake" and then placing the shake into extraction tubes.  A filter is placed over the open end of the extraction tube and held in place by a clamp.  Next, a spigot is

---

[6]  "Trim" is the part of the marijuana plant other than the bud.

run from a butane can to a hole in the extraction tube, causing the butane to discharge through the tube. The butane goes from a gas to a liquid as it goes through the tube, extracting the trichomes and hallucinogens from the marijuana to form a liquid with the butane. After the liquid is filtered and collected, the THC is separated from the butane, which slowly dissipates in proper ventilation. The substance is then placed on a non-stick surface in an oven, which is used to evaporate any remaining butane from the concentrated cannabis. Next, a vacuum pump is hooked up to the oven to slowly purge any remaining solvent. The end product is concentrated cannabis oil that has a glassy, shatter-like appearance and is honeycomb colored.

Butane and ethyl alcohol are solvents that strip different elements from marijuana. It takes three to four minutes to run a can of butane through a tube. A pound of "shake" takes at least five, 300 milliliter cans of butane to process into concentrate. Butane should not be stored at temperatures of 110 degrees Fahrenheit or above. Butane used for lighters typically is not stored in freezers, but some people do store butane in freezers believing it may lead to a higher yield for extracting concentrated cannabis.

The trailer in defendant's driveway had all of the equipment necessary to manufacture concentrated cannabis using butane extraction. Detective Lewis opined that the concentrated cannabis in this case was manufactured through the butane extraction method.

Citrus Heights Police Detective Seth Cimino testified as an expert in the manufacturing of concentrated cannabis. He participated in about 25 investigations involving the manufacture of concentrated cannabis through butane extraction. Around half of the investigations involved a butane explosion. Ethanol is used to "winterize" concentrated cannabis, which purifies concentrated cannabis obtained through butane extraction. It can also be used to extract concentrated cannabis at the beginning of the process.

8

Asked a hypothetical that tracked the facts of this case, Detective Cimino opined that this indicated the manufacture of concentrated cannabis with butane through single blast extraction.

4. *Defendant's Text Messages*

Text messages from defendant's cell phone were admitted into evidence. On November 3, 2015, he texted someone named "Riq": "Would you be down to take my trim and make something again? Keep half like last time?" The next day he texted "Tane! Sonny" and said: "Hey Sonny whats up its Rob with patients in mind how've you been? Do you have any master cases of our five I can pick up." Sony replied by asking defendant how many he needed. Detective Cimino opined that "Tane! Sonny" referred to a person dealing in butane, "master cases" referred to cases containing 96 cans of butane. A text from Sonny to defendant stating, "That's my normal super market bro!" suggested a meeting between defendant and Sonny.

A person named Shane texted defendant on November 8, 2015. That day, defendant texted back: "Im gonna have to run[7] stuff before that its cosing [*sic*] me at this poiny [*sic*]." Following this, there was an exchange of texts between defendant and Shane, which, according to Detective Cimino, showed a partnership between the two in which Shane was supposed to produce concentrated cannabis.

Additional text messages showed the business deal fell through, with one text from defendant's phone stating: "Because im now out of inventory its been a while and haven't been able to get any production done. This was going to work based on production. There should have been finished inventory by now. That's why I was turning it over to you." Another text from defendant's phone instructed Shane on how to

---

[7] "Run" is a term commonly used in connection with making concentrated cannabis.

clean the "tubes." Detective Cimino believed the term "tubes" referred to the extraction tubes used to make marijuana concentrate through butane extraction.

A text message to Shane from defendant said Shane could save a lot of time, "by prepping cans and product." Shane texted defendant, "What's to getting tane ready . . . having it out?" Defendant replied, "Pull tops pull tabs and re box" and "I'll have to show u both." Detective Cimino believed this all referred to using butane to make cannabis concentrate.

On January 13, 2016, "Katie" texted defendant, "Any news?" Defendant replied, "No its still 60 lbs behind everything else. I'm probably going to have to find a new concentrate person," "Haven't gotten a sing [*sic*] batch back yet," and "Yeah hence the reason I only have cO2 on menu" and "Know anyone who wants to buy an entire concentrate business and be shown how to do it correctly for barely the cost of equipment?" Detective Cimino opined the equipment referred to in the text was for making concentrate with butane. Defendant also texted Katie that he was, "going corporate" and had no time to produce. He also texted Katie, "not many things can make you 20K in one night . . . " and "I did that three times last year . . . its good business just no time to do it." According to Detective Cimino, this referred to making concentrated cannabis three times in the last year.

On February 13, 2016, someone using a phone with a number ending 5230 texted defendant: "Heads up—Avery is here this week and Kate doesn't want us extracting while he's here so we gotta wait til next weekend February 20-21."

On February 23, 2016, "Barrel BT Trevor" texted defendant, "How do u think that Jedi would return on a closed loop." Defendant replied: "No clue, I never ran closed loop" and "Just tubes but I would suspect decent." Detective Cimino opined that the "BT" in "Barrel BT Trevor" stood for butane, and the term "closed loop" referred to a process for manufacturing marijuana concentrate with butane.

10

A "Pineapple Sam" texted defendant on February 25, 2016: "Im gonna blast all 9 units that we kept out and were gonna loss on collective. Damnnnn you weren't joking about those 12% genetics." On February 26, 2016, Barrel BT Trevor texted defendant: "If you blast jedi. I'd love to know the returns and quality how it comes out." Detective Cimino believed the term "blast" referred to a term used in butane manufacturing of concentrated cannabis and "units" referred to pounds. "Jedi" referred to "Jedi Kush," a strain of marijuana.

Defendant texted Pineapple Sam on April 13, 2016 and asked: "Have a line on a concentrate guy. How did alfreds guy work out?" Shortly thereafter a "Concentrate BT Arron" with a number ending in 7983[8] texted defendant: "Hey bro . . . I can head ur [sic] way in about 15min . . . You got an address for me and I'll put it in my GPS . . ."

On April 19, 2016, defendant texted Pineapple Sam: "New concentrate guys the shit . . . " and "Closed loop dewaxing . . . super light and stable" and "He onky [sic] has one oven so he is limited but for sure good dude so far." Detective Cimino opined that this showed that the person texting Pineapple Sam was pleased with his new manufacturing person, who was using a closed loop system for making cannabis concentrate with butane.

On April 20, 2016, "Concentrate BT Arron" texted defendant: "Hey bud! The oil is done and looks amazing! Smells great! I can get it to you right now . . . It just won't be grammed out . . . Sorry, [j]ust don't have the time to do it today with having to be at Orbit at 2:30pm today! I can include my packing tho [sic] if you need . . . ." He shortly thereafter texted defendant: "It's 131 grams total to you (so 262 half grams if I was to package it) I still have to distill tane and run today . . . ."

---

[8] The same last four digits as Aaron Matthew's cell phone.

Text messages between defendant and Concentrate BT Arron on April 24, 2016, showed meeting between the two was planned. Defendant texted Concentrate BT Arron that he was bringing to the meeting: "Durban poison 860.7 Jedi kush 1040.5 Knock out punch 2200 Space queen 303.8 Shark shock 226.8 Pim premo mix 306.5 Harlie Quinn 759.5." Detective Cimino believed these all referred to different strains of marijuana, with the numbers referring to weight in grams. Concentrate BT Arron replied: "Nice!! Might take me a minute to run thru it all but hell ya! Flavors for days!" Detective Cimino stated this referred to a lot of product, which might take Concentrate BT Arron a long time to manufacture.

Concentrate BT Arron texted defendant on May 13, 2016 and told him that all of his "oils" will be done Sunday afternoon. Other texts that day show a planned meeting between defendant and Concentrate BT Arron on May 15, 2016. On the day of the planned meeting, defendant texted Concentrate BT Arron to ask about the "numbers", which Detective Cimino believed was a reference to the final weights of the manufactured products. Later that day, Concentrate BT Arron texted defendant: "Durban Poison—Ran 825g Return 82.2g Jedi Kush—Ran 1003g Return 67g Space Shock—Ran 579g Return 35g Harlequin—Ran 658g Return 43g PIM + Harlequin Mix— Ran 398g Return 23g Knockout Punch—Ran 640g Return 57g Knockout Punch-Ran 1267g Return 132g[.] These are TOTAL weights w/o the %s being taken out . . . I still have about 300 grams or so of the KOP that didn't fit in a column this last time I ran it . . .I like to have at least 1lb to load in a column to run at one time . . . Tighter its packed the better the yield . . . Not sure if it was the strains or how old they are but those are HORRIBLE yields this time around!!" According to Detective Cimino, the numbers referred to starting weight in marijuana and finishing weight in cannabis oil, while "a column" stands for an extraction tube.

Text messages between defendant and Concentrated BT Arron on May 26, 2016, showed their business relationship was deteriorating because of a disagreement over how

much to compensate Concentrated BT Arron for his services. Defendant texted an offer to provide Concentrated BT Arron an oven and gas to boost his production. Detective Cimino believed gas referred to butane while oven referred to a vacuum oven.

The next day, defendant texted Pineapple Sam that there was a problem with the "concentrate guy." Defendant texted to Pineapple Sam that the concentrate guy had ruined five batches of the product.

*The Defense*

Analytical chemist Savino Sguera testified that winterization was a process used to remove the remaining waxes from concentrated cannabis. Concentrated cannabis is placed in alcohol, with the mixture subjected to cold temperatures until the waxing products (fats and lipids) solidify and can be strained out. The remaining alcohol is then evaporated from the concentrate. He has never seen butane stored in a freezer.

Butane was a popular extraction method as it could preserve the smell and flavor of the marijuana while efficiently extracting the cannabinoids and terpenes. "Blasting" refers only to butane extraction. Other methods of extracting THC from marijuana are ethanol, bubble hash, and $CO_2$ extraction.

Called as a defense witness, Detective Garcia testified that Patients in Mind engaged in over $200,000 in transactions. The interior garage door in defendant's house was locked on the day of the search.

Ngan Ly, a member of the Patients in Mind collective, maintained cars, helped manage the grow, and delivered products to patients. Ly was paid in cash and did not know how the concentrated cannabis was made. Patients in Mind had lighters and torches which Ly filled with butane from cans at Gudis' house.

Ly knew of the trailer parked in front of defendant's house in 2015 and 2016. It was used to transfer "coco", a dirt-type material, waste from the marijuana trimmings, and nutrients for the plants. Ly did not know of the trailer ever being used as a mobile manufacturing lab. He never saw defendant's son have permission to access the

marijuana grow in defendant's garage, and he never saw defendant's son around loaded firearms. He never saw defendant's son in a situation that made Ly concerned for the boy's health or safety.

Fingerprints found on the side of a Reynolds Wrap box and an Across International vacuum vessel were not defendant's or Gudis.

Brett Bissell, a member of Patients in Mind with medical issues, used marijuana from Patients in Mind to relieve his pain.

Chris Conrad testified as an expert in cannabis. A collective is a group of patients associated within California for cultivating medical marijuana. Indoor grow operations are not inherently dangerous; the primary risks are mold, water leaks, and electrical system overload. He has seen 100 to 200 indoor marijuana grows, with only half a dozen having fires. Having reviewed case information on over 500 collectives, less than 20 had violent crime. Conrad admitted medical dispensaries involve many cash transactions, and marijuana operations are not likely to report criminal activity to the police.

Winterization is the process of separating waxes and plant matter from cannabis through a change in temperature. The same can be accomplished through distillation, which involves heat, dissolution, and condensation. Fats and lipids from marijuana contain cannabinoids that can be used topically.

It is illegal to manufacture butane honey oil. Butane is highly flammable. The risk of explosion increases if the extraction is done in a small, enclosed area.

*Rebuttal*

Rhonda Johnson was the fingerprint expert who took the prints from defendant's home which were submitted as defense evidence. A person can touch an object and not leave a fingerprint.

14

DISCUSSION

I

*Motion to Quash and Suppress*

Defendant contends the trial court prejudicially erred in denying his motion to quash the search warrants and suppress the evidence found pursuant to them.

A. *The Warrants and Motion*

1. *First Search Warrant*

The first search warrant at issue here was for defendant's and Gudis' financial records, issued on April 27, 2016.

Detective Garcia provided the supporting affidavit, which sets forth relevant facts. He had completed an 80-hour POST-certified advanced narcotics training course and an eight-hour course on the manufacture and investigation of butane honey oil. He had been to at least 10 indoor and outdoor marijuana grows and had testified as an expert regarding the sale of marijuana and other controlled substances.

In February 2016, he received information from an anonymous citizen that marijuana was being grown at 9633 Linda Rio Drive, in Sacramento. The informant had seen several large marijuana plants inside a partially open garage door and had observed a white male adult who was 5 feet 10 inches tall and 310 pounds at the residence. Detective Garcia did a records check for the address and found a May 2014 welfare check in which defendant was listed as the resident. The caller, the mother of defendant's child, reported that marijuana was being sold out of defendant's home. Since the children at the residence were fine, the responding deputies did not enter the residence. A Department of Motor Vehicles (DMV) check for defendant listed his address at a residence located at 9486 Mira Del Rio Way, Sacramento, around the corner from the 9633 Linda Rio Drive residence. Defendant's DMV physical description was 5 feet nine inches tall and 280 pounds. Detective Garcia believed defendant was the person described by the citizen informant at 9633 Linda Rio Drive.

Later that month, Detective Garcia contacted SMUD Revenue Protection representative, Robert Duggan. Duggan, who had investigated over 130 indoor marijuana grows, told Detective Garcia that the high-power usage at 9633 Linda Rio Drive, Sacramento, 9,043 kWh (kilowatt hour) a month, for the last year and 11,550 kWh in the prior month, was the product of a large-scale marijuana grow at the address. The high-power usage puts a major strain on SMUD's service wires, meters, and electrical panels, creating a safety hazard.

Detective Garcia drove by 9633 Linda Rio Drive on February 11, 2016, where he saw a truck registered to defendant and an automobile registered to Gudis parked in the driveway. Both vehicles were registered at the 9486 Mira Del Rio Way address.

An internet search for Patients in Mind found a Web site, <http://www.patientsinmind.com> [as of Feb. 11, 2016], that advertised home delivery of medical marijuana. The Web site described Patients in Mind as a nonprofit medical cannabis collective and mobile dispensary in Sacramento County. Patients in Mind was registered with the Secretary of State. Gudis was listed as the person for service, with an address of 9486 Mira Del Rio Way, Sacramento.

On February 16, 2016, Detective Garcia conducted a traffic stop on a car registered to Gudis and driven by Iman Shabazz, who was on active searchable probation. A search of Shabazz discovered a small quantity of marijuana in a package labeling it as medical marijuana from Patients in Mind. Shabazz had a credit card in Gudis' name with the company name, Patients in Mind. He said the credit card was a company gas card for him to use and Gudis provided the vehicle for him to use for deliveries.

On February 24, 2016, Detective Garcia and a deputy collected trash from a garbage bin in front of the Mira Del Rio address. The officers found mail addressed to defendant and Gudis. Also found was a bank deposit slip at Bank of America for $5,680, dated February 1, 2016. The listed available balance was $9,189.87.

16

A lead intelligence analyst with the Sacramento County Regional Threat Assessment Center provided information about the following transactions of defendant:

On April 8, 2009, there was a withdrawal of $27,586 from defendant's Wells Fargo Bank in Sacramento. On May 28, 2009, there was a withdrawal of $12,000 from defendant's Wells Fargo Bank in Sacramento. On February 20, 2013, there was a $12,500 withdrawal from defendant's account at Roseville Bank in Roseville.

From April 1, 2015 to July 13, 2015, defendant had an account at U.S. Bank. Twenty-seven transfers were conducted during that time, with defendant and Patients in Mind receiving $44,651.77. The account was eventually closed by U.S. Bank for risk mitigation. On February 1, 2016, there was a $15,170 deposit to defendant's account at Bank of America in Sacramento.

The affidavit also listed the following transactions for Gudis:

On December 12, 2008, there was a $19,500 withdrawal from Gudis' account with Bank of America in Rancho Cordova. On January 11, 2010, there was a $16,451 deposit into Gudis' account at Wells Fargo Bank in Sacramento for a "Retail Store." On August 27, 2013, there was a $12,200 withdrawal from Gudis' account at Wells Fargo Bank. On June 8, 2015, there was an $11,000 withdrawal from Gudis' account at Bank of America in Rancho Cordova.

The financial information was confirmed by currency transaction reports obtained from the United States Department of the Treasury.

In Detective Garcia's experience, persons involved in marijuana sales often safeguard parts of their illegal proceeds by placing them in legitimate savings accounts, checking accounts, and safety deposit boxes. Illegal funds are often comingled with legitimate funds. Illegal funds are laundered through bank accounts to try to show legitimate income, and people involved in such activities use companies to hide profits and further launder funds.

17

Detective Garcia opined that Gudis, and defendant are involved in the sale and distribution of marijuana for profit, and funds maintained in any of their accounts are the product of illegal drug transactions, as were funds paid to any accounts for Patients in Mind.

The warrant sought to compel delivery of financial information from various banks concerning defendant, Gudis, and Patients in Mind.

2. *Second Warrant*

The second warrant was issued on May 31, 2016, for a search of the residences and vehicles of defendant and Gudis.

Detective Garcia submitted a supporting affidavit which restated the same allegations supporting the first warrant. In addition, SMUD representative Duggan told Detective Garcia that the power usage at 9633 Linda Rio for the billing cycle of March 9, 2016, to April 6, 2016, was 11,555 kWh. Duggan again concluded a large-scale marijuana grow was occurring within the residence.

On April 27, 2016, Detective Garcia requested documents from financial institutions regarding defendant, Gudis, and Patients in Mind. Records received showed defendant opened an account with Bank of America on February 15, 2015; between its opening and April 27, 2016 the account showed $198,833.81 in deposits and $197,875.06 in withdrawals and payments. A large number of the deposits were from Square, Inc., a credit card processing application. A marijuana sales related Web site called "weedmaps.com" showed Patients in Mind as a listed company advertising medical marijuana deliveries that also took credit cards.

When Detective Garcia drove by the 9633 Linda Rio Drive residence on May 23, 2016, he saw that the truck registered to defendant that was previously seen parked in the driveway, parked in the same spot. Numerous pipes and electrical conduits were entering the garage wall. Based on his training and experience, Detective Garcia found this to be consistent with supplying power and water for an indoor marijuana grow.

18

Detective Garcia drove by 9486 Mira Del Rio Drive and saw a car registered to Shabazz parked across the street and Gudis standing in the front yard.

Detective Garcia concluded the affidavit by asserting defendant and Gudis were involved in the sale of marijuana for profit and marijuana was being grown for sale at the 9633 Linda Rio Drive residence.

3. *The Motion*

After the preliminary hearing, Gudis, joined by defendant, filed a motion to quash the warrants and suppress the resulting evidence. Following additional briefing and argument the trial court denied the motion, finding probable cause supported by the financial information in each warrant, as well as the power usage.

The trial court further found that if the warrants were not supported by probable cause then suppression was not required under the good faith exception to the exclusionary rule.

B. *Analysis*

"In reviewing a search conducted pursuant to a warrant, an appellate court inquires 'whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 161.) Probable cause exists for a search warrant when there is a fair probability that contraband or evidence of a crime will be found in the place to be searched. (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 548].) The issuing magistrate need only make "a practical, common-sense decision . . . , given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information . . . ." (*Ibid.*) The probable cause standard is a " 'practical, nontechnical conception' " that focuses on probabilities that exist under a particular set of facts. (*Id.* at p. 231 [76 L.Ed.2d at p. 544].) Probable cause describes reasons to be suspicious, not a prima facie case of guilt. (*People v. Thuss* (2003) 107 Cal.App.4th 221, 236.) The possibility of an innocent explanation for the

19

facts in the affidavit " ' "does not deprive the [magistrate] of the capacity to entertain a reasonable suspicion . . . ." ' [Citation.]" (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1784.)

"[L]aw enforcement officers may draw upon their expertise to interpret the facts in a search warrant application, and such expertise may be considered by the magistrate as a factor supporting probable cause. [Citation.]" (*People v. Nicholls* (2008) 159 Cal.App.4th 703, 711.) " 'Reasonable suspicion' may be based not only upon the circumstances and conduct recited in the affidavit but also upon the affiant's interpretation of and opinion about those circumstances and conduct." (*People v. Tuadles, supra*, 7 Cal.App.4th at p. 1784.)

"Whether an affidavit provided the magistrate ' "substantial basis" ' for concluding there was probable cause is an issue of law 'subject to our independent review.' [Citation.] But, because '[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause,' we accord deference to the magistrate's determination and ' "doubtful or marginal" ' cases are to be resolved with a preference for upholding a search under a warrant. [Citations.]" (*People v. French* (2011) 201 Cal.App.4th 1307, 1315.) In addition, because courts have a " 'strong policy favoring search by warrant rather than upon other allowable basis[,]' [Citations.] . . . when, as here, the police do obtain a warrant, that warrant is presumed valid." (*People v. Amador* (2000) 24 Cal.4th 387, 393.) Ultimately, " 'the magistrate's determination will not be overturned unless the supporting affidavit fails as a matter of law to support the finding of probable cause. [Citations.]' [Citation.]" (*French,* at p. 1315.)

Defendant asserts the affidavits did not provide probable cause for the warrant to search his residence. Specifically, he claims the affidavits did not support a finding he was engaged in unlawful activity or had items related to criminal activity in his

20

residence[9]. According to defendant, the facts presented in the affidavit show lawful rather than unlawful activity. Although there was evidence of a marijuana grow, defendant notes Patients in Mind was listed as a cooperative registered with the Secretary of State, and that the marijuana found in Gudis' vehicle was labeled as medical marijuana from Patients in Mind.

At the time the warrant in question was issued: "Subject to subdivision (b), qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate cannabis for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570." (Former Health & Saf. Code, § 11362.775, subd. (a), added by Stats. 2015 ch. 689, § 6.) California law exempted the collective or cooperative cultivation "of medical marijuana by qualified patients and their designated caregivers from prosecution or abatement under specified state criminal and nuisance laws that would otherwise prohibit those activities. [Citation.]" (*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 737.) This was an affirmative defense against a charge of possession of marijuana for sale for qualifying persons and entities. (*People v. Anderson* (2015) 232 Cal.App.4th 1259, 1274; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 786.) This defense was unavailable to those engaged in a profit-making enterprise. (*People v. Jackson* (2012) 210 Cal.App.4th 525, 529.)

The fact that defendant's enterprise could be a medical marijuana operation does not render the probable cause findings invalid as a matter of law. The existence of facts that may support a defense does not preclude a probable cause finding. (*People v. Fisher*

---

[9] The 9633 Linda Rio Drive, Sacramento residence.

(2002) 96 Cal.App.4th 1147, 1150-1152.) Accordingly, before marijuana was generally legalized by Proposition 64, the Control, Regulate and Tax Adult Use of Marijuana Act, (Health & Saf. Code, § 11362.1) in November 2016, an affidavit did not have to include facts establishing that marijuana was not possessed or cultivated for medical use to establish probable cause to search. (*People v. Clark* (2014) 230 Cal.App.4th 490, 493, 499.)

The undisputed facts in the first affidavit provide probable cause that defendant was involved in a marijuana growing operation. A citizen informant reported that marijuana was being grown at the 9633 Linda Rio Drive residence after having seen marijuana plants through a partially open garage door, DMV records matched defendant's physical description to the person described at that address by the informant, the mother of defendant's child previously reported he was selling marijuana out of his home, defendant's truck was parked at the address, and the high power usage at the address all support probable cause of a marijuana grow at the residence and defendant's connection to it. Although the affidavit did not have to show the medical exception was inapplicable, the financial information contained therein supports an inference of a larger operation that took in sums sufficient to be consistent with a business, an inference reinforced by the traffic stop and subsequent statements of Shabazz, who said Gudis runs Patients in Mind, admitted Gudis let him use the credit card for deliveries for Patients in Mind, and had a credit card in the name Gudis and Patients in Mind. Defendant's connection to Gudis was shown by both of their vehicles parked at the Linda Rio Drive residence and registered at the Mira Del Rio Way residence. The search of the garbage can, left curbside at the Mira Del Rio address, confirmed both lived at that residence, tying defendant to Gudis and therefore Patients in Mind.

In short, the affidavit provides probable cause that defendant and Gudis, were involved together in the growth and sales of marijuana through Patients in Mind, possibly for profit. The trial court correctly denied the motion to quash and suppress this warrant.

22

The second warrant, which was supported by an affidavit relating the same relevant facts as the first, is further supported by the financial information showing significant money going into and out of defendant's Bank of America account, with a significant portion coming from credit cards. Evidence in the affidavit that Patients in Mind advertised on a marijuana Web site that it took credit cards further reinforced the inference that Patients in Mind was doing significant business and that defendant and Gudis may be illegally profiting from it.[10] The presence of piping and wires consistent with a marijuana grow operation going into the Linda Rio Drive garage and Shabazz's car parked by the Mira Del Rio Way residence, further ties both residences to the marijuana operation. Like the first, the second warrant is supported by probable cause that defendant and Gudis were involved in an illegal for-profit marijuana operation at the two residences through Patients in Mind. The trial court was correct to deny the motion to suppress this warrant as well.

## II

### *Sufficiency of the Evidence*

Defendant contests the sufficiency of the evidence to sustain both convictions and the enhancement. The same standard of review applies to the convictions and enhancement.

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.] Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." [Citation.]' [Citation.] 'The question is whether, after viewing the evidence

---

[10] The fact that deposits and withdrawals almost balance does not defeat an inference the marijuana was being sold for profit, as it is reasonable to infer that profits from the enterprise would likely be realized to defendant and Gudis by withdrawals from the account.

in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the underlying enhancement [or conviction] beyond a reasonable doubt.' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1197, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) " ' If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]' [Citation.]" (*People v. Miranda* (2016) 2 Cal.App.5th 829, 834.) We do not reweigh the evidence or reevaluate witness credibility. (*Ibid.*)

A. *Child Endangerment*

Section 273a, subdivision (a) provides in relevant part as follows: " '[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death . . . having the care or custody of any child,. . . willfully causes or permits. . . that child to be. . . placed in a situation where his or her person or health is endangered, shall be punished. . . ' " by imprisonment. " "Great bodily harm refers to significant or substantial injury and does not refer to trivial or insignificant injury." [Citation.]' [Citation.]" (*People v. Clair* (2011) 197 Cal.App.4th 949, 954.)

Section 273a, subdivision (a) "is 'intended to protect a child from an abusive situation in which the probability of serious injury is great.' [Citation.]" (*People v. Sargent* (1999) 19 Cal.4th 1206, 1216.) However, there is no requirement " 'that the actual result be great bodily injury.' [Citation.]" (*Ibid*.)

Whether an act is done " 'under circumstances or conditions likely to produce great bodily harm or death,' " i.e., under conditions in which the probability of serious injury is great, is a question for the trier of fact. (*People v. Sargent, supra*, 19 Cal.4th at pp. 1221, 1223; *People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204 [" 'likely' as used in section 273a means a substantial danger, i.e., a serious and well-founded risk"].) The circumstances and conditions a reasonable jury could consider in determining whether the totality of the circumstances created a substantial danger of great bodily harm or

24

death include: "(1) the characteristics of the victim and the defendant, (2) the characteristics of the location where the abuse took place, (3) the potential response or resistance by the victim to the abuse, (4) any injuries actually inflicted, (5) any pain sustained by the victim, and (6) the nature of and amount of force used by the defendant." (*People v. Clark* (2011) 201 Cal.App.4th 235, 245.)

Felony child endangerment requires proof of criminal negligence, a higher degree of fault than ordinary negligence. (*People v. Valdez* (2002) 27 Cal.4th 778, 788.) " ' "The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences." ' [Citation.]" (*Ibid.*)

Defendant contends there is insufficient evidence that he placed his son in a situation likely to produce great bodily injury or death. We disagree.

The evidence is undisputed that defendant and his son lived at the 9633 Linda Rio residence. Detective Garcia testified to this fact, and defendant and his son were present there when the search warrant was executed at the home. While defendant's son was not harmed by the marijuana operation at the home he shared with defendant, there is sufficient evidence to support a finding that defendant acted with criminal negligence in subjecting his son to the requisite risk of great bodily injury or death by a combination of conducting the indoor grow in the garage, extracting cannabis concentrate from the marijuana through the dangerous open blast butane process, and conducting at least part of the marijuana business at the residence.

Although growing marijuana indoors does not necessarily present dangers to the residents where it is grown, this one did. The SMUD representative testified that the grow room continuously used large amounts of power, which was itself dangerous due to the stress this caused to the wiring, and that the wiring to sustain the grow was both

25

unpermitted and dangerous. Added to this is the real danger presented by how defendant manufactured the marijuana concentrate he was making at the home. As the prosecution expert concluded, items seized in the trailer, very large quantities of butane, the presence of marijuana concentrate, and the marijuana shake in test tubes each with a coffee filter attached to the open end of the tube with a clamp and a small hole drilled into the bottom, was consistent with making marijuana concentrate through the open blast butane method. This conclusion was further reinforced by defendant's text messages showing that he made marijuana concentrate and did so using butane. The prosecution also presented expert evidence from Detective Garcia and from Matthews, a person who used butane to make marijuana concentrate, that this method risked causing an explosion due to the volatile nature of butane. In addition, there was expert testimony that butane risked explosion or fire if stored above 110 degrees Fahrenheit, and the jury could reasonably find the risk real with 888 containers of butane stored in a trailer with no shade or covering on the driveway of the home where defendant's son lived. Added to this, is the expert testimony regarding the risk of home invasion robbery or other violence associated with the marijuana business, evidence that is reinforced by the presence of cash, marijuana and firearms found at the home where defendant and his son lived.

We conclude that the presence of all of these risks, taken together, provides substantial evidence that defendant acted with criminal negligence in placing his son at risk of death or great bodily injury.

B. *Firearm Enhancement*

Section 12022, subdivision (c) provides for an enhancement of three, four, or five years for "any person who is personally armed with a firearm" in the commission of certain enumerated offenses, including the unlawful manufacture of concentrated cannabis. This provision is "part of The Dangerous Weapons Control Law, which regulates a wide range of unlawful activities involving firearms and other deadly weapons. (§ 12000 et seq.) Unlike section 12022.5, which imposes enhanced penalties

26

for personal use of a firearm in the commission of a felony, section 12022 'does not require that a defendant utilize a firearm or even carry one on the body.' [Citations.] A defendant is armed under section 12022 as long as the gun is 'available for use, either offensively or defensively.' [Citation.]" (*People v. Pitto* (2008) 43 Cal.4th 228, 236.)

Defendant asserts the evidence was insufficient to show he was armed during the commission of the crime of unlawfully manufacturing cannabis to sustain the true finding on the enhancement. He notes no firearm was found in the trailer where the concentrate was supposedly manufactured or in the garage where the marijuana was grown, and he had no firearm on his person when he interacted with the "product, equipment, or persons purportedly involved in the processing of marijuana concentrate." According to defendant the evidence shows only that he had firearms, they were legally registered to him, and were stored in his house.

In *People v. Bland* (1995) 10 Cal.4th 991, 995-996 (*Bland*), the defendant was convicted of possession of cocaine base for the purpose of sale and was found to have been armed during the commission of the offense within the meaning of section 12022. The cocaine base was found in the defendant's bedroom closet; under the bed was a cache of unloaded firearms. (*Id.* at p. 995.) The Court of Appeal found insufficient evidence to support the arming enhancement based on the fact that the defendant was outside the house when police found the drugs and firearms in his bedroom. (*Id.* at p. 996.)

Our Supreme Court disagreed and reinstated the enhancement, explaining: "Possessory drug offenses are continuing crimes that extend throughout a defendant's assertion of dominion and control over the drugs, even when the drugs are not in the defendant's immediate physical presence. Therefore, when the prosecution has proved a charge of felony drug possession, and the evidence at trial shows that a firearm was found in close proximity to the illegal drugs in a place frequented by the defendant, a jury may reasonably infer: (1) that the defendant knew of the firearm's presence; (2) that its

27

presence together with the drugs was not accidental or coincidental; and (3) that, at some point during the period of illegal drug possession, the defendant had the firearm close at hand and thus available for immediate use to aid in the drug offense. These reasonable inferences, if not refuted by defense evidence, are sufficient to warrant a determination that the defendant was 'armed with a firearm in the commission' of a felony within the meaning of section 12022." (*Bland, supra*, 10 Cal.4th at p. 995.)

The *Bland* court also explained: "Of course, contemporaneous possession of illegal drugs and a firearm will satisfy the statutory requirement of being 'armed with a firearm in the commission' of felony drug possession only if the evidence shows a nexus or link between the firearm and the drugs. The federal courts, in interpreting the federal counterpart to California's weapons enhancement law (18 U.S.C. § 924 (c)(1)), have described this link as a 'facilitative nexus' between the drugs and the gun. [Citation.] Under federal law, which imposes specified prison terms for using or carrying a firearm " 'during and in relation to' " a crime of drug trafficking, 'the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence.' [Citation.] So too in California." (*Bland, supra*, 10 Cal.4th at p. 1002.) However, while "section 12022 implicitly requires both that the 'arming' take place *during* the underlying crime and that it have some '*facilitative nexus*' to that offense," "[e]vidence that a firearm is kept in close proximity to illegal drugs satisfies this 'facilitative nexus' requirement; a firearm's presence near a drug cache gives rise to the inference that the person in possession of the drugs kept the weapon close at hand for 'ready access' to aid in the drug offense." (*Ibid.*)

Although the underlying felony here involved the illegal manufacture rather than illegal possession of marijuana, *Bland* nonetheless guides our decision to affirm the enhancement. The felony underlying the enhancement, the unlawful manufacture of a controlled substance, "is a continuing crime in that it extends through time and is not

limited to a discrete event." (*People v. Delgadillo* (2005) 132 Cal.App.4th 1570, 1575.) It can thus "both over time and at various locations." (*Ibid*.)

In *Delgadillo*, the jury sustained a section 12022-armed enhancement for unlawfully manufacturing a controlled substance (methamphetamine) where the gun was found in defendant's bedroom, while the drug manufacturing equipment and ingredients were found in the trunk of a car and locked bed of his truck that had been found nearby; both had been parked in or near the home. (*People v. Delgadillo, supra*, 132 Cal.App.4th at pp. 1572-1573.) The Court of Appeal found sufficient evidence to support the enhancement: "Because the firearms were in defendant's bedroom along with a significant sum of money, and in close proximity to cars in which defendant and his colleagues stored lab equipment and raw material, those firearms were available to defendant to use offensively or defensively at any time during the manufacturing process." (*Id*. at p. 1573.)

Here, the marijuana concentrate was produced in the trailer on the driveway and was grown in the garage of defendant's Linda Rio Way residence where the firearms were found. Firearms were found in defendant's bedroom, placing them in close proximity to where the marijuana to make the concentrate was grown and the trailer where it was made. Defendant had firearms in close proximity to the two places critical to the illegal manufacture of marijuana concentrate.[11] Substantial evidence supports the enhancement.

---

[11] There was a dissent in *Delgadillo* based on the fact that the methamphetamine was manufactured in a different location and there was no evidence defendant ever went to the lab. (*People v. Delgadillo, supra*, 132 Cal.App.4th at pp. 1575-1576 (Gaut, J. dissenting.).) That reasoning is inapplicable here as the marijuana was grown and the concentrate from it was made on defendant's property.

C. *Manufacturing Marijuana Concentrate*

Defendant contends there is insufficient evidence he actually manufactured concentrated cannabis with butane to support his conviction. He claims that even if there was evidence, he was manufacturing concentrated cannabis, the evidence was insufficient that he did so through a means prohibited by Health and Safety Code section 13379.6, subdivision (a).

Health and Safety Code section 11379.6, subdivision (a) states: "Except as otherwise provided by law, every person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction or independently by means of chemical synthesis, any controlled substance specified in Section 11054, 11055, 11056, 11057, or 11058 shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for three, five, or seven years and by a fine not exceeding fifty thousand dollars ($50,000)."

This prohibits using butane to extract marijuana concentrate. (*People v. Bergen* (2008) 166 Cal.App.4th 161, 172-173.) As it is a continuing offense, Health and Safety Code section 11379.6, subdivision (a) "encompasses the initial and intermediate steps carried out to manufacture, produce or process" a controlled substance. (*People v. Lancellotti* (1993) 19 Cal.App.4th 809, 813.) Accordingly, each and every stage in the manufacturing process is criminalized. (*People v. Luna* (2009) 170 Cal.App.4th 535, 543.)

According to defendant, none of the prosecution's witnesses knew what method was being used to manufacture the concentrated cannabis. He claims the opinions of prosecution witnesses that the concentrate was illegally manufactured were based on speculative conclusions and could not provide a reasonable inference of guilt.

As defendant admits, cannabis concentrate was found in the trailer. He correctly points out there is no direct evidence of how it was made. The concentrate was tested only to determine it was derived from plant material rather than a synthetic; it was not

30

tested to determine what method was used to extract it from the plant. There is nonetheless considerable evidence from which the jury could infer that the concentrate was illegally extracted with butane.

A large quantity of butane was found in the trailer along with tubes containing ground cannabis prepared in a manner consistent with the butane extraction method for producing concentrate.[12] Other devices used in butane extraction, such as a vacuum purge pump and a vacuum oven, were also found in the trailer. The inference that the concentrate was extracted using butane was further reinforced by defendant's text messages, which show conversations about producing concentrate and using butane, some with Matthews, who had admitted to producing concentrate through butane extraction.

We are not persuaded by defendant's argument that the evidence was insufficient to support the conviction because evidence of other methods of concentrate manufacture was present in the form of a bubble hash machine in the trailer and a $CO_2$ canister. The $CO_2$ canister was found under a mobile bar inside the house, a location consistent with its use in making carbonated beverages rather than marijuana concentrate. While a bubble hash machine was in the trailer, many more items found there (and defendant's text message conversations) were consistent with butane extraction. "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998)

---

[12] Each tube had a filter attached to the open end with a metal clamp and a hole drilled into the closed end. Detective Garcia testified that tubes prepared in this way were used to make concentrate through butane extraction.

18 Cal.4th 297, 331.) Since a jury could reasonably infer the manufacture of cannabis concentrate through the prohibited means of butane extraction, substantial evidence supports the conviction.

### III

*Evidence of Marijuana and Violent Crime*

Defendant's final contention is that the trial court prejudicially erred and deprived him of due process in overruling his objection to testimony from Detective Garcia regarding violent crimes associated with marijuana. We disagree.

A. *Background*

Over defendant's objection, Detective Garcia gave expert testimony regarding various types of crimes committed in places like marijuana grow houses or dispensaries.

Detective Garcia testified:

"There are numerous cases where there have been marijuana home envisions [*sic*] of grow houses, marijuana evasions of home dispensaries. I'm currently investigating a case right now where a 85-year-old man was killed in his living room during a marijuana transaction that was being done by a person selling weed out of their home. The deal went bad and unfortunately the man lost his life and the seller was shot as well.

"I investigated a case where subjects who were involved in a robbery, they were a robbery crew that were doing dozens of home invasions in places where marijuana was grown.

"And as a result of the argument over dissemination of the proceeds amongst the crew that's robbing or stealing from people where the marijuana is then divided out amongst the codefendants, they took one of their codefendants out in a pear orchard in Walnut Grove and executed him."

He further explained: "There's home invasions that start out as a generally a known person or someone who's there to conduct business related to marijuana one way or another, someone's [*sic*] who's buying or selling or something to do with that. They

get into the home and then they generally brandish the firearm or weapon and rob the occupants at home. "

After a defense request for a sidebar was denied, Detective Garcia continued: "There's burglaries in the sense where subjects will come—I've investigated crimes where subjects have gone to grow houses that they thought were unoccupied either during the day or at night. They force their way or break in or come in either an unlocked or open window. They get into the home to steal the processed marijuana, cash, weapons, guns, all the things that are normally associated with a marijuana-growing enterprise in a home and a resident is home, a family member is home and something goes bad in there and people end up getting hurt, shot, killed, stabbed. A lot of the stolen firearms that are stolen from the grows, because growing marijuana at your residence is an inherently danger [*sic*] business."

The trial court instructed the jury not to consider the testimony about the execution.

B. *Analysis*

"Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice. [Citation.] Evidence Code section 352 gives the trial court discretion to exclude evidence if 'its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.)

The evidence at issue showed the potential danger defendant's business posed to his son who lived where there was marijuana concentrate being made and at least some quantities of cash were present and was thus relevant to the child endangerment charge. The danger of the marijuana business was also relevant to show defendant had a motive to possess the firearm to protect that business (as well as himself and his son) from potential robbers.

This relevant evidence was not unduly prejudicial. Undue prejudice arises with evidence that " ' "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." ' [Citation.]" (*People v. Jones* (2012) 54 Cal.4th 1, 61.) The evidence here did not involve any criminal conduct by defendant, but rather the conduct of others who would try to rob or harm him or his son because of the marijuana operation in their shared residence. While the evidence may put defendant in a bad light because he is exposing his son to such a risk, that inference simply makes the evidence relevant rather than unduly prejudicial. " '[T]he prejudice which . . . Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) If Detective Garcia's testimony may have overstated the risk presented by defendant's marijuana operation, that was a matter for defendant to contest at trial (which he did through his own expert testimony regarding the risk of robbery for marijuana business) and for the jury to determine in weighing the evidence.

We conclude it was not an abuse of discretion for the trial court to admit the evidence. Since the evidence was properly admitted, there was no due process violation. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 998 [proper application of the rules of evidence ordinarily does not violate due process].)

# DISPOSITION

The judgment is affirmed.

　　　　　\s\　　　　　　　，
BLEASE, Acting P. J.

We concur:

　　　\s\　　　　，
ROBIE, J.

　　　\s\　　　　，
DUARTE, J.